# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                                                                    No. CR 04-1677 JB

DONOVAN NEHA JONES and
DION LAMY,

        Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Dion Lamy's Motion to Suppress

Statements, filed March 28, 2005 (Doc. 82).  The Court held an evidentiary hearing on the motion

on September 19, 2005, and oral argument on September 22, 2005.  The primary issue is whether the

Court should suppress statements that Lamy made to two FBI agents on July 22, 2002.  Consistent

with the Court's ruling at the hearing on this motion, and for the reasons given at the time of the

hearing, the Court will deny the motion.

## STANDARD OF REVIEW

Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its essential

findings on the record when deciding a motion that involves factual issues.  The findings of fact in this

Memorandum Opinion and Order shall serve as the Court's essential findings for purposes of rule

12(d).  The Court makes these findings under the authority of rule 104(a) of the Federal Rules of

Evidence, which requires a judge to decide preliminary questions relating to the admissibility of

evidence.  See United States v. Merritt, 695 F.2d 1263, 1269 (10th Cir. 1982).  In deciding such

preliminary questions, the other rules of evidence, except those with respect to privileges, do not bind

the Court.  See Fed. R. Evid. 104(a).  Thus, the Court may consider hearsay in ruling on a motion to

suppress.  See United States v. Merritt, 695 F.2d at 1269.

## FINDINGS OF FACT

1.      On July 22, 2002, FBI Special Agents Steven Chambers and Marcus McCaskill

interviewed Lamy twice.  See Transcript of Hearing at 23:16-22, 26:8-11 (taken September 19,

2005).[1]

2.      At the time of the interviews, Lamy lived with his mother in Zuni, New Mexico.  See

id. at 96:8-10, 97:21-23.

3.      On the morning of July 22, 2002, the agents interviewed Lamy at his family's kitchen

table.  See id. at 23:16-18.  At least one other family member was present in the house during the

interview.  See id. at 25:8-12.  This other family member was in and out of the living area, but did

not sit down at the kitchen table during the interview.  See id. at 30:23-31:3.

4.      Before beginning the interview, McCaskill gave Lamy an advice of rights form and

explained it to Lamy, but did not read it verbatim to Lamy.  See id. at 34:1-8.  McCaskill gave Lamy

the Miranda warnings.  See id. at 36:10-11.  McCaskill orally explained that: Lamy did not have to

talk to him; statements Lamy made to McCaskill could be used against him; Lamy had the right to

speak to an attorney; Lamy could obtain a lawyer if he could not afford one; and Lamy's most

important right is that McCaskill would stop questioning Lamy if Lamy did not want to answer any

more questions.  See id. at 34:12-35:14, 42:18-25.  McCaskill then provided the form to Lamy and

allowed him to read it for himself.  See id.  McCaskill told Lamy that he would not be arrested that

_____

[1] The Court's citations to the transcript of the hearing refer to the Court Reporter's original,
unedited version.  Any finalized transcript may contain slightly different page and/or line numbers.

day regardless of what Lamy told McCaskill.  See id. at 36:6-15.  Lamy signed the waiver before he

made any statements.  See id. at 38:8-13.

     5.     The advice of rights form stated:

**YOUR RIGHTS**

Before we ask you any questions, you must understand your rights.  You have the
right to remain silent.  Anything you say can be used against you in court. You have
the right to talk to a lawyer for advice before we ask you any questions.  You have
the right to have a lawyer with you during questioning.  If you cannot afford a lawyer,
one will be appointed for you before any questioning if you wish.  If you decide to
answer questions now without a lawyer present, you have the right to stop answering
at any time.

**WAIVER OF RIGHTS**

I have read this statement of my rights and I understand what my rights are.  At this
time, I am willing to answer questions without a lawyer present.

Advice of Rights Form at 1 (executed by Dion Lamy on July 22, 2002).

     6.     Lamy produced a three-page statement during this interview.  See Transcript of

Hearing at 24:12-19 (taken September 19, 2005).  While he was preparing this statement, Lamy did

not walk into the living room or leave the kitchen at any time.  See id. at 31:4-7.  On this statement,

Lamy made a number of misspellings that Lamy had scratched out.  See id. at 31:8-32:5.  The agents

reviewed the statement after Lamy had finished writing it and asked him to initial the places where

he had scratched out misspellings.  See id. at 32:1-10.  The agents did not help Lamy write the

statement.  See id. at 32:5-6.

     7.     Lamy can write intelligently.  See generally Statement of Dion Lamy.

     8.     Lamy's initial statement blamed three unidentified people for raping the alleged victim.

See id. at 43:1-8.

     9.     During the interview, Lamy did not seem to be uncomfortable beyond a normal level

-3-

of discomfort experienced by interview subjects.  See id. at 35:15-36:3.  One of the agents sat down next to Lamy, while the other agent stood next to the table.  See id. at 103:17-104:1.

10.     During the interview, Lamy's mother was in her bedroom, with the radio playing.  See id. at 113:8-19.  Lamy's mother did not hear the officers raise their voice or yell, nor did she hear any other inappropriate noises.  See id. at 113:24-114:4.

11.     At some point after the initial interview on July 22, 2002, the agents returned to Lamy's house and asked him to speak with them in their vehicle.  See id. at 24:19-22.  The agents then interviewed Lamy in the agents' vehicle, which was parked in front of Lamy's house.  See id. at 23:19-22, 44:20-25.  The agents' purpose during this interview was to clear up inconsistencies and what they believed to be lies from the first interview.  See id. at 25:24-25:1, 43:9-12.  One of the agents sat in the driver's seat, the other agent sat in the back, and Lamy sat in the passenger's seat. See id. at 99:18-22.

12.     During this second interview, Lamy produced another statement.  See id. at 25:1-2.

13.     Lamy's mother did not see anything inappropriate taking place in the car.  See id. at 116:9-15.  When Lamy returned to the house, he did not look like he had been crying.  See id. at 116:21-23.

14.     Before the interview on July 22, 2002, McCaskill was not aware that Lamy was a straight F student in the eighth grade.  See id. at 33:3-6.

15.     None of Lamy's family members were present with Lamy in the kitchen during either interview on July 22, 2002.  See id. at 25:5-7.

16.     McCaskill had interviewed Lamy on two occasions before July 22, 2002.  See id. at 26:17-21.  McCaskill had interviewed him in December 2001 and in April 2002.  See id. at 39:24-

-4-

40:6.  On one of those occasions, McCaskill had interviewed him regarding a burglary investigation, in which he asked both Lamy and Lamy's mother to sign a waiver of rights form because Lamy was still a minor at that time.  See id. at 33:7-22.

17.     McCaskill had no difficulty communicating with Lamy.  See id. at 38:2.  It did not appear to McCaskill that Lamy ever had problems communicating with McCaskill during the interviews on July 22, 2002, nor did it appear to McCaskill that Lamy did not understand what was happening.  See id. at 45:6-14.

18.     Lamy dropped out of school after the eighth grade.  See id. at 96:21-25.  At the time, Lamy's grades consisted of F's.  See id. at 97:3-6.  His mother has never seen him read a book or a newspaper.  See id. at 98:6-9.  Dr. Samuel Roll concluded, after examining Lamy, that Lamy's reading ability was at the second grade level, placing him low in the first percentile of readers at his age.  See id. at 60:6-10.  Dr. Roll determined that Lamy was not mentally retarded.  See id. at 75:10-11.

19.     The Court held an evidentiary hearing on the motion on September 19, 2005, and heard arguments on September 22, 2005.

20.     The Court finds that McCaskill was credible in his testimony in the September 19, 2005 hearing.

21.     The totality of the circumstances surrounding the interrogation of Lamy on July 22, 2002, establish that his statement was voluntary.

## PROCEDURAL BACKGROUND

On August 25, 2004, a federal grand jury returned a five-count Indictment against Donovan Neha Jones, Lamy, and Aaron Cheama.  The grand jury charged Lamy in Counts I and II of violating 18 U.S.C. § 2242(2)(B), Sexual Abuse, and 18 U.S.C. § 2, Aiding and Abetting.  The Indictment also charged Lamy in Counts III and IV of violating 18 U.S.C. § 113(a)(4), Assault by Striking, Beating, or Wounding, and 18 U.S.C. § 2, Aiding and Abetting.  Finally, the grand jury charged Lamy in Count V of violating 18 U.S.C. § 2244(a)(2), Abusive Sexual Contact.

On February 25, 2005, a federal grand jury returned a seven-count Superseding Indictment against Lamy and Neha.[2]  The Superseding Indictment charged Lamy in Counts I-III of violating 18 U.S.C. § 2242(2)(B), Sexual Abuse, and 18 U.S.C. § 2, Aiding and Abetting.  The grand jury also charged Lamy in Counts IV-V of violating 18 U.S.C. § 113(a)(4), Assault by Striking, Beating, or Wounding, and 18 U.S.C. § 2, Aiding and Abetting.  Finally, the Superseding Indictment charged Lamy in Counts VI-VII of violating 18 U.S.C. § 2244(a)(2), Abusive Sexual Contact, and 18 U.S.C. § 2, Aiding and Abetting.

Lamy moves the Court, pursuant to the Due Process Clause of the Fifth Amendment of the United States Constitution, to suppress the statements that he made to the FBI agents on July 22, 2002.[3]  See Defendant Dion Lamy's Motion to Suppress Statements ("Motion to Suppress") at 3-4.

---

[2] Cheama plead guilty to Count II of the original indictment on November 18, 2004.

[3] Twice in his briefing on this motion, Lamy refers to Miranda v. Arizona, 384 U.S. 436 (1966).  See Defendant Dion Lamy's Motion to Suppress Statements at 2; Lamy Reply to Government's Response to Motion to Suppress Statements at 2, filed May 9, 2005 (Doc. 117).  The Court considered the possibility that Lamy was arguing that the Court should suppress his statements because he did not voluntarily waive his Miranda rights.  The Court concludes, however, that Lamy has not raised a Miranda argument.

Lamy asserts that he did not voluntarily make these statements because his limited cognitive abilities render him incapable of understanding his rights and making a voluntary statement.  See Lamy Reply to Government's Response to Motion to Suppress Statements ("Reply") at 1-2, filed May 9, 2005 (Doc. 117).  Also, the United States informed the counsel for the Defendants before the hearing that Special Agent Chambers was unavailable to testify because of a special assignment he had in France.[4] See Transcript of Hearing at 10:24-11:3 (taken March 24, 2005).  Lamy contends that Chambers' failure to appear at the suppression hearing is relevant and important to a fair finding of fact, and that the Court should suppress the statements if Chambers does not appear at the hearing.  See Motion to Suppress at 1-2.

The United States opposes this motion, arguing that there are no facts indicating that the FBI agents coerced Lamy's statements.  See Government's Response to Defendant's (Lamy's) Motion to Suppress ("Response") at 4, filed April 18, 2005 (Doc. 106).  The United States urges the Court to look at the agents' conduct, instead of Lamy's sophistication, or lack thereof, to determine the voluntariness of his statements.  See id. at 5.  The United States also argues that the agents took

---

First, Lamy refers to Miranda merely in passing, without setting forth the voluntariness standard under Miranda.  See id.  Lamy does not argue that he was in custody or under interrogation, two prerequisites to invoke Miranda's protections.  See Dickerson v. United States, 530 U.S. 428, 432 (2000).  Even if Lamy did argue these two points, the Court does not believe that Lamy was in custody at the time he made the statements because he was at home, the agents told him that he could end the conversation at any time, and the agents explained that they would not arrest him that day regardless of what he told them.  Second, Lamy expressly argues that the Court should exclude his statements based on the totality of the circumstances test associated with the due process requirement of voluntariness, not the Miranda test.  See Defendant Dion Lamy's Motion to Suppress Statements at 4-5; Lamy Reply to Government's Response to Motion to Suppress Statements at 1-2.  Third, the cases Lamy cites are cases analyzing statements under the Due Process Clause.  See id.

[4] Since then, both parties have informed the Court that Chambers is now in El Paso, Texas.  See Transcript of Hearing at 6:6-11, 7:15-16 (taken September 22, 2005).

precautions to protect Lamy's rights, such as having him sign an "Advice of Rights" form before questioning him, and did not assault or threaten Lamy in any way. <u>Id.</u> at 6.  Finally, the United States asserts that it is not necessary to have both agents testify at the hearing because both were witnesses to the interviews of Lamy.  <u>See</u> <u>id.</u>

At the hearing, Lamy argued that he did not have to show improper police conduct to prevail on the motion to suppress.  <u>See</u> Transcript of Hearing at 11:13-20 (taken September 22, 2005). Lamy asserted that he only needed to show his incapacity to give a voluntary statement to the police, which he had done by presenting evidence of his limited intelligence. <u>See</u> <u>id.</u> at 11:13-20, 13:19-25, 16:4-12.  Lamy also affirmed to the court his belief that the police had engaged in coercive conduct while interviewing him.  <u>See</u> <u>id.</u> at 11:21-12:15.  When asked if there was evidence of improper or coercive police conduct, Lamy said that he would point to the fact that the interviews were not recorded.  <u>See</u> <u>id.</u> at 12:2-15.  Lamy also highlighted testimony offered at the hearing about "acquiescent set," which is a purported tendency to defer to those in authority.  <u>See</u> <u>id.</u> at 16:13-23. Lamy suggested that the Court could suppress the statements for any use, or admit the statements only for impeachment if Lamy takes the stand.  <u>See</u> <u>id.</u> at 14:7-13.  Lamy agreed that the United States only needed to prove voluntariness by a preponderance of the evidence.  <u>See</u> <u>id.</u> at 15:6-10.

The United States countered that Lamy's bad grades in school do not necessarily indicate that he could not understand his rights.  <u>See</u> <u>id.</u> at 17:25-18:9.  The United States emphasized Lamy's prior encounters with the FBI as reason to believe that he comprehended his rights.  <u>See</u> <u>id.</u> at 18:9-24.  The United States asserted that Lamy must show not only limited intelligence, but must also prove that the agents engaged in coercion.  <u>See</u> <u>id.</u> at 18:25-19:16.  The United States noted that Lamy's mother did not hear any yelling or see any crying during or after the interview.  <u>See</u> <u>id.</u> at

20:10-18.

## LAW REGARDING VOLUNTARINESS OF STATEMENTS

The Fifth Amendment to the United States Constitution provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law."  The Due Process Clause requires that, to be admissible, statements by a defendant must have been made voluntarily.  See Dickerson v. United States, 530 U.S. 428, 433 (2000)("Over time, our cases recognized two constitutional bases for the requirement that a confession be voluntary to be admitted into evidence: the Fifth Amendment right against self-incrimination and the Due Process Clause of the Fourteenth Amendment." (citing Brown v. Mississippi, 297 U.S. 278 (1936), and Bram v. United States, 168 U.S. 532, 542 (1897));  Jackson v. Denno, 378 U.S. 368, 376 (1964)("It is now axiomatic that a defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession, and even though there is ample evidence aside from the confession to support the conviction." (citations omitted)).

The Supreme Court of the United States has declared that a defendant has the constitutional right "at some stage in the proceedings to object to the use of the confession and to have a fair hearing and a reliable determination on the issue of voluntariness." Jackson v. Denno, 378 U.S. at 376-77 (citation omitted).  The United States must show that the statement was voluntary by a preponderance of the evidence.  See Missouri v. Seibert, 542 U.S. 600, 608 n.1 (2004)(citation omitted); Lego v. Twomey, 404 U.S. 477, 489 (1972)("[T]he prosecution must prove at least by a preponderance of the evidence that the confession was voluntary."); United States v. McCullah, 76 F.3d 1087, 1100 (10th Cir.)("The prosecution has the burden of proving by at least a preponderance

of evidence that the confession was voluntary." (citation omitted)), reh'g denied, 87 F.3d 1136 (10th Cir. 1996).

The due process voluntariness test examines "whether a defendant's will was overborne by the circumstances surrounding the giving of a confession." Dickerson v. United States, 530 U.S. at 434 (internal quotations omitted)(quoting Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973)). "The due process test takes into consideration the totality of all the surrounding circumstances -- both the characteristics of the accused and the details of the interrogation." Id. (internal quotations omitted)(citations omitted). The Court must weigh "the circumstances of pressure against the power of resistance of the person confessing." Id. (internal quotations omitted)(quoting Stein v. New York, 346 U.S. 156, 185 (1953)). The Supreme Court has reaffirmed this analysis as recently as 2000. See id. ("We have never abandoned this due process jurisprudence, and thus continue to exclude confessions that were obtained involuntarily.").

The Supreme Court has instructed that, "[a]bsent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." Colorado v. Connelly, 479 U.S. 157, 164 (1986). In reviewing its suppression cases, the Supreme Court found "a substantial element of coercive police conduct" that justified suppression. Id. The Supreme Court has made clear that "while mental condition is surely relevant to an individual's susceptibility to police coercion, mere examination of the confessant's state of mind can never conclude the due process inquiry." Id. at 165. The Supreme Court has explained that any other rule "would expand our previous line of 'voluntariness' cases into a far-ranging requirement that courts must divine a defendant's motivation for speaking or acting as he did even though there be no claim that governmental conduct coerced his decision." Id. at 165-

-10-

66.

## ANALYSIS

The Court finds that the United States has carried its burden of proving, by a preponderance of the evidence, that Lamy's statements were voluntary. The United States, through the testimony of Special Agent McCaskill, presented evidence of the circumstances surrounding Lamy's statements. This evidence indicates that the FBI agents did not overwhelm Lamy's will or coerce him into making these statements.

The Court must analyze the totality of the circumstances to determine whether the FBI agents violated Lamy's right to due process. See Dickerson v. United States, 530 U.S. at 434. These facts indicate that Lamy's will was not overborne by the police such that he made statements involuntarily. First, Lamy made his statements in familiar surroundings, either in his kitchen or in a police car parked in front of his house. See Transcript of Hearing at 23:16-22, 44:20-25 (taken September 19, 2005).

Second, the FBI agents took steps to ensure that Lamy understood his rights and was willing to speak with them of his own volition. Before beginning the interview, McCaskill informed Lamy of his rights, including Lamy's right not to speak to the agents and his right to end the conversation whenever he wished. See id. at 34:12-35:14, 42:18-25. McCaskill also told Lamy that he would not be arrested that day regardless of what he said during the interview. See id. at 36:6-15. Before making any statements, Lamy signed an advice of rights form, which explained his rights and asked him to affirm that he understood those rights. See id. at 38:8-13; Advice of Rights Form at 1.

Finally, there is no indication in the record of coercive action by the agents. The agents did not take part in writing Lamy's statement. See Transcript of Hearing at 32:5-6 (taken September 19,

2005).  Lamy's mother did not hear the officers yell or raise their voices, nor did she hear any other inappropriate noises, during the first interview.  See id. at 113:24-114:4.  When the agents interviewed Lamy the second time, his mother did not notice anything inappropriate taking place in the car, nor did he look like he had been crying when he returned to the house.  See id. at 116:9-15-23.  Lamy did not seem uncomfortable during the first interview, nor did McCaskill have trouble communicating with Lamy during either interview.  See id. at 35:15-36:3, 38:2.

To rebut this evidence, Lamy presented witnesses and documentation to show that his limited intelligence makes him incapable of understanding his rights and voluntarily making these statements.  Lamy dropped out of school upon completing the eighth grade, after receiving all F's on his report card.  See id. at 96:21-25, 97:3-6.  Also, Dr. Roll told the Court that he diagnosed Lamy as having a second-grade reading level, below the first percentile of readers of his age.  See id. at 60:6-10.  His mother also said that she had never seen him read a book or a newspaper.  See id. at 98:6-9.

While the evidence may demonstrate that Lamy's intelligence is below average, it does not establish that Lamy had difficulty understanding his rights.  As an initial matter, it does not take a superior intellect to comprehend the right not to speak to the police, nor does it require above average intelligence to know the difference between what is true and false.  As for Lamy specifically, McCaskill testified that he had no difficulty communicating with Lamy.  See id. at 38:2.  It did not appear to McCaskill that Lamy did not understand what was happening.  See id. at 45:6-14.  Lamy's statement, although containing errors of spelling and basic sentence construction, takes the reader step-by-step through the events of that night, demonstrating an ability to understand events unfolding around him and to reflect upon them.  See generally Statement of Dion Lamy.  Also, Lamy's reading

level does not impact whether he understood his rights because McCaskill testified that he also explained Lamy's rights to him verbally.  <u>See</u> Transcript of Hearing at 34:1-8 (taken September 19, 2005).  Finally, the Court notes that Lamy's prior encounters with the criminal justice system, and particularly his prior interactions with McCaskill and familiarity with McCaskill's technique of explaining verbally the rights of the interview subject, undermine Lamy's assertion that his below average intelligence prevents him from understanding his rights.  <u>See id.</u> at 26:17-21, 33:7-22, 39:24-40:6.

Even if the Court credits Lamy's argument on his intelligence, the fact remains that Lamy has not produced evidence that the agents' conduct was in any way improper or coercive.  When the Court asked Lamy's attorney during arguments on the motion to suppress what evidence existed on coercion, he pointed to the fact that the agents did not record the interviews.  <u>See</u> Transcript of Hearing at 12:2-15 (taken September 22, 2005).  While the lack of a tape recording of the conversations may go to the credibility of the agents' testimony, it alone does not shed much, if any, light on the issue of coercion.  The lack of a tape recording does not make it more likely that the agents applied an unconstitutional level of pressure to Lamy.

Lamy has not pointed to any portions of McCaskill's testimony or the record that hint at coercion.  This evidence is necessary because  a due process violation requires "a substantial element of coercive police conduct" that caused the defendant to give the statement.  <u>Colorado v. Connelly</u>, 479 U.S. at 163-64.  The Supreme Court has explained that evidence of the defendant's mental condition is not dispositive on the issue of voluntariness without evidence of improper police conduct.  <u>See id.</u> at 164-65.  In light of the Supreme Court's guidance, the Court will not suppress the statements merely on the basis of Lamy's alleged intelligence when he has not shown misconduct by

the agents.

Lamy also contends that Agent Chambers' absence from the hearing on the motion to suppress is an additional ground to suppress Lamy's statements. <u>See</u> Motion to Suppress at 2. Lamy asserts that cross-examining McCaskill is insufficient to safeguard Lamy's right to a fair hearing on the motion to suppress. <u>See id.</u> McCaskill, however, was present during the interviews and is fully capable of recounting the events of July 22, 2002. <u>See</u> Transcript of Hearing at 23:16-22, 26:8-11, 99:18-22, 103:17-104:1 (taken September 19, 2005). Lamy has not explained what Chambers will add to the evidence that will benefit the Court's consideration of the motion to suppress. If anything, Chambers' testimony would likely be duplicative of McCaskill's testimony. Also, Lamy did not represent that he attempted to subpoena Chambers. Lamy's opportunity to cross-examine McCaskill at the hearing satisfied his constitutional right to test the United States' version of events.

Finally, Lamy relies on the testimony of Dr. Roll to show that Lamy suffers from "acquiescent set," which is a purported tendency to defer to those in authority. <u>See</u> Transcript of Hearing at 16:13-23 (taken September 22, 2005). The Court has considered his testimony, yet nonetheless concludes that Lamy's statements were voluntary. Roll's testimony did not establish that Lamy, although he may generally wish to please authority, made his statements because he felt an urge to tell the agents whatever they wished to hear. In fact, even if Lamy did answer the agents' questions in a certain way because of an internal compulsion to satisfy the agents, this fact does not illuminate whether the police coerced Lamy into making incriminating statements. Furthermore, Lamy demonstrated an ability to defy the supposed wishes of the agents by initially telling them that he had nothing to do with the alleged rape. <u>See</u> Transcript of Hearing at 43:1-8 (taken September 19, 2005).

The totality of the circumstances surrounding the interview of Lamy on July 22, 2002, shows that Lamy made his statements voluntarily. The United States' evidence demonstrates voluntariness by a preponderance of the evidence. The United States' use of Lamy's statements will not violate his Fifth Amendment due process rights. Accordingly, the Court will not suppress the United States' use, including during any cross-examination of Lamy, of the statements. The statements are admissible for all purposes, including impeachment.

**IT IS ORDERED** that the Defendant Lamy's Motion to Suppress Statements is denied.

_____
UNITED STATES DISTRICT JUDGE

_Counsel:_

David C. Iglesias
   United States Attorney
Fred C. Smith
Stan Whitaker
   Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

     _Attorneys for the Plaintiff_

Jason Bowles
B. J. Crow
Albuquerque, New Mexico

     _Attorneys for Defendant Donovan Jones Neha_

John F. Moon Samore
Albuquerque, New Mexico

     _Attorney for Defendant Dion Lamy_